## STANTON et al. v. COMMISSIONER OF INTERNAL REVENUE.

Nos. 10268, 10269.

United States Court of Appeals Seventh Circuit.

May 15, 1951.

Rehearing Denied June 27, 1951.

Lawrence P. Mattingly, Samuel Morgan, and Morgan, Salter & Sellery, all of Chicago, Ill., for petitioners.

Theron L. Caudle, Asst. Atty. Gen., Melva M. Graney, Asst. to Asst. Atty. Gen., Ellis N. Slack, Sp. Asst. to Atty. Gen., for respondent.

Before MAJOR, Chief Judge, and KERNER and DUFFY, Circuit Judges.

KERNER, Circuit Judge.

The problem presented by this review of two decisions of the Tax Court is whether certain 1944 income derived from the activities of the Feed Sales Company, a partnership, is taxable to the two taxpayers as individual partners or as trustees of two trusts to which they assigned their entire partnership interests for the benefit of close relatives—the mother in one case, the wife in the other. The solution depends on whether the income was produced mainly by personal service, as the Tax Court found, or by capital consisting principally of good will, as petitioners contend. In passing upon that question we must be mindful of the well established rule that the Tax Court is the agency designated by law to find and examine the facts and draw conclusions, and that its decision is not to be disturbed unless "clearly erroneous."

The Feed Sales Company was originally organized in January 1943 for a two-year term by five men for the purpose of buying, selling, and dealing in grain, stock feed and other commodities. It was anticipated that these commodities would become very profitable as a result of a shortage of corn, resulting in a heavy demand for granular flour, a wheat product for use in the production of industrial alcohol. All five partners were stockholders and directors of the Red Wing Malting Company, a corporation engaged in the manufacture of malt and having its offices in Chicago. The taxpayer Stanton was general manager of the company and he was also an independent broker, one of the largest dealers in the country in the sale of rye and malt. He conducted this business from the Red Wing offices. Of the four other partners, one was employed by one of the major milling companies; a second was purchasing agent for one of the three largest distilling companies in the country; a third was purchasing agent

for a major manufacturer of commercial feed for livestock and poultry; and the fourth was sales manager of a concern manufacturing bottle caps, seals and labels for distilleries. The latter had only a 5% interest in the partnership and the other four had 23.75% each. The partnership agreement provided that no partner should sell or assign all or any part of his interest without the written consent of all other partners.

Immediately after the formation of the partnership, oral commitments were obtained from five of the large milling companies and four or five smaller mills to broker their entire production of granular flour at the customary fee, fifty cents a ton. Arrangements were also made for the partnership to buy mill feed, a by-product in the manufacture of granular flour, from the same concerns. The difference in the method of handling the two products resulted from the fact that under OPA regulations no brokerage fee was allowed on the sale of mill feed but it could be sold at a fifty cent markup over purchase price. The mills welcomed the use of Feed Sales to handle these products since their sales organizations were not set up for these types of business.

The original capital invested by the partners was $500, contributed pro rata. The partnership had no other tangible assets except its books of account and, perhaps, some office furniture. The quarters of the Red Wing corporation were used as offices and the office personnel divided their time between the business of Red Wing, Feed Sales, and Stanton's independent grain brokerage. The partnership agreement provided for the payment of $7,200 a year salary to Stanton as business manager on a part time basis.

As anticipated, there was an enormous demand for both products and there was no sales problem at all, only one of allocating their supplies to the demand. All sales were in carload lots shipped direct from mills to purchasers, hence no warehouse facilities were needed or provided. With the exception of one loan of $35,000 from Red Wing shortly after Feed Sales began doing business, the original $500 capital was sufficient for its operations. This loan was required for the purchase of mill feed and was repaid within a month or so from commissions or profits. The business was unexpectedly successful, resulting in profits of over $82,000 for 1943, the first year of its operations.

In January 1944 Stanton transferred his entire interest in the partnership to himself as trustee of a trust for the benefit of his mother, primarily in order to provide for her support, according to his testimony, although he did admit that he also had in mind the saving of some federal income taxes. At the same time two other partners, Springer and Burdick, executed identical trust instruments in favor of their wives. All three of these trusts were irrevocable during their respective terms, fifteen years in the case of the Stanton one, ten for the other two, unless sooner terminated by the death of the beneficiaries in which case the principal of the trust estates and all undistributed income were to be distributed as appointed by the respective beneficiaries or to their heirs on failure to exercise their powers of appointment. The original partnership was terminated and a new partnership agreement was drawn up according to the terms of which the three men who had formerly been members of the partnership as individuals became members as trustees for their respective trusts.

The new partnership reported ordinary net income for the year 1944 of $265,885, of which the two taxpayers here involved each received $63,147 as the distributive share for his trust. Springer died in January 1946; after his death his trust was withdrawn from the partnership, and shortly thereafter the Stanton and Burdick trusts were also withdrawn, after which a new partnership composed of the four surviving original partners was organized and continued doing the same type of business until the demand for granular flour subsided as a result of the ending of the war.

The controversy here involved is as to the tax status of the two $63,147 shares

distributed to Stanton and Springer as trustees for their respective trusts. Both had reported the income for the trusts.

There is no doubt about the fact that the major factor in the production of the income was the practically exclusive control of the supplies of two products in very great demand. Petitioners contend that this control stemmed from the oral commitments which constituted good will which must be defined as capital. They point to evidence that the demand for the products controlled by them was so great that the participation of Stanton or any other partner was not required to dispose of them, their only problem being one of equitable distribution which could have been carried out by anyone. But as the Tax Court replied to this contention, "This evidence * * * does not establish the fact that the partnership was not a personal service business but, at most, shows that the artificial demand created by war conditions did not require the partners to devote the care and attention to the business which would have been necessary under normal economic conditions."

We find further reason for disagreement with petitioners in their classification of their oral commitments as good will. Randolph Paul in his Federal Estate and Gift Taxation, Vol. II, ¶18.16, comments on the difficulty of defining the term good will. However, we note that the various definitions quoted all appear to relate to some advantage in the competition for *customers*, not for commodities to sell to those customers. Here, Stanton testified, the demand was so great that they could pick their accounts and in fact did pick those who would pay invoices the day they got them. Moreover, it appears that the precise factors which we think the court correctly found to be responsible for the production of the income here involved are expressly excluded from the definition of good will: "Ability, skill, experience, acquaintanceship, personal clientele, and other personal characteristics and qualifications do not constitute good will." And while it is true that various contract rights are also included in intangible properties, we seriously doubt that the commitments here involved rise to the dignity of such contract rights. We find nothing in the record to indicate that they were ever actually binding and enforceable, but it appears that they were continued in effect from year to year because it suited the convenience of the suppliers to dispose of their products through the channels provided by them. We agree with respondent that the trusts could make a capital contribution to Feed Sales of commitments only if the interests in Feed Sales they received from Stanton and Springer in January 1944 and retransferred to Feed Sales included an asset consisting of standing and binding commitments. The very informal arrangements here relied upon do not qualify as such, even though they were actually carried out during the tax year.

The Tax Court suggests another basis for its ruling in that petitioners' conveyance of their partnership interests to the trusts did not deprive them of the opportunity to recapture the going business at a later date, noting that the four surviving partners reorganized the partnership upon the withdrawal of all three trusts shortly after the death of Springer early in 1946. We think this makes the situation comparable to that in Commissioner v. Sunnen, 333 U.S. 591, at pages 608, 609, 68 S.Ct. 715, 92 L.Ed. 898, where the Supreme Court held that a taxpayer assigning to his wife certain license contracts between himself and a corporation of which he was the majority stockholder retained such control over the contracts by virtue of the corporate power to cancel them on notice, that the royalties accruing thereunder were taxable to himself rather than to his assignee.

We agree with the Tax Court that under the circumstances here appearing the assignment of taxpayers' legal title to their partnership interests did not relieve them of their obligation to pay income taxes on the distributive shares of the partnership income.

Decisions affirmed.