GRENADA INDUSTRIES, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

NATIONAL HOSIERY MILLS, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Dockets Nos. 24571, 24640.   Promulgated August 22, 1951.

*Robert A. Littleton, Esq.,* for the petitioners.
*Lester M. Ponder, Esq.,* for the respondent.

236

244

248

OPINION.

RAUM, *Judge:* 1. At the outset, we dispose of respondent's contention that the asserted deficiencies are supported by section 22 (a) of the Internal Revenue Code. Throughout the argument based upon section 22 (a) there is implicit the suggestion that the entities of Hosiery and Abar should be disregarded and that their income be attributed to Industries and National. We cannot accept that position.

Hosiery and Abar were functioning entities. Each in fact rendered valuable services. True, all four organizations were actually controlled by the same persons, and neither Hosiery nor Abar had any employees who were not also officers or employees of Industries or National, so that all of the functions discharged by Hosiery and Abar could have been performed just as readily by Industries and National. But the fact is that Hosiery and Abar were valid partnerships, and they actually did play real parts in the hosiery business. Hosiery did furnish styling and merchandising services to Industries; Abar did engage in the business of salvaging defective hosiery. There is no basis, upon this record, for disregarding the organizational entities of Hosiery and Abar. Cf. *Chelsea Products, Inc.*, 16 T. C. 840; *Estate of Julius I. Byrne*, 16 T. C. 1234; *Seminole Flavor Co.*, 4 T. C. 1215, 1234–1235.

The income actually earned by Hosiery and Abar may not be attributed to Industries or National under section 22 (a). This does not mean, however, that either Industries or National was at liberty, tax-

wise, to deflect to Hosiery or Abar any portion of the income really earned by Industries or National. In such circumstances the general provisions of section 22 (a) are undoubtedly sufficient to charge the income to the one that actually earned it. Cf., e. g., *Lucas* v. *Earl*, 281 U. S. 111; *Griffiths* v. *Commissioner*, 308 U. S. 355; *Helvering* v. *Eubank*, 311 U. S. 122; *Commissioner* v. *Sunnen*, 333 U. S. 591; *Lyman A. Stanton*, 14 T. C. 217, affd. (C. A. 7, 1941) 189 F. 2d 297. But in the case of organizations under common control, the detailed provisions of section 45 of the Code [3] explicitly authorize the Commissioner to unscramble any such situation, so that income may be charged to the organization that earned it. Thus, to the extent that section 45 may be applicable, section 22 (a) adds nothing to the strength of respondent's position here. We pass, therefore, to a consideration of section 45.

2. That all four organizations were "owned or controlled directly or indirectly by the same interests" within the meaning of section 45 is abundantly clear on this record. All four organizations were dominated primarily by the two Goodmans, and to a lesser degree by Kobin and Barskin. We are satisfied that Solar and Stevens were subservient to the wishes of the Goodmans and Kobin.[4]

It is immaterial that the record ownership of the various stock and partnership interests may not have been in the identical persons or trusts at the same times. Throughout the years in question the J. A.

---

[3] SEC. 45. ALLOCATION OF INCOME AND DEDUCTIONS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Commissioner is authorized to distribute, apportion, or allocate gross income or deductions between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

Section 45 was amended by Section 128 of the Revenue Act of 1943 (c. 63, 58 Stat. 21) as follows:

Section 128 (b). TECHNICAL AMENDMENT.—Section 45 (relating to allocation of income and deductions) is amended by striking out "gross income or deductions" and inserting in lieu thereof "gross income, deductions, credits, or allowances."

Section 128 (c). TAXABLE YEARS TO WHICH APPLICABLE.—The amendments made by this section shall be effective with respect to taxable years beginning after December 31, 1943. The determination of the law applicable to prior taxable years shall be made as if this section had not been enacted and without inferences drawn from the fact that the amendment made by this section is not expressly made applicable to prior taxable years.

[4] In an attempt to show Solar's independence, petitioners presented testimony that in one instance Solar vigorously complained about the repairing of certain of Industries' defective hosiery by National at Indianapolis rather than returning the hosiery to Grenada where it could have been repaired at lower cost by non-union labor. That incident surely does not establish or even indicate that Solar was not at all times subject to the complete domination of the Goodmans and Kobin. For, if Solar were correct in his contention that the repairing of the defective hosiery in Indianapolis resulted in higher costs, it is only too clear that the Goodmans and Kobin, as well as Barskin, would have acquiesced in his position. He was sponsoring a position that was in their interest, and it would strain our credulity to suggest that Solar would have persisted in any course of action contrary to the considered judgment of the Goodmans and Kobin and antagonistic to the interests which they were protecting.

Goodman family owned 35 per cent, the L. L. Goodman family 35 per cent, the Kobin family 20 per cent, and Barskin 10 per cent of the common stock of Industries and National. The same percentage interests were applicable to both partnerships, Hosiery and Abar, until 1943, when they were changed slightly (but in the same proportion) so as to admit Solar's wife as a record partner with a 9.09 per cent interest—an event which in no way affected the control or management of either enterprise. Although it is true that the record ownership of the stock or partnership interests may not have been in the same persons or the same family trusts, the fact is that the 35–35–20–10 ratio (representing the proportionate interests of the Goodman and Kobin families and Barskin in relation to each other) was at all times maintained and that the actual control at all times material, represented by those interests, was really exercised by J. A. Goodman, L. L. Goodman, Kobin, and Barskin.

Section 45 speaks in sweeping terms. It refers to "two or more organizations, trades, or businesses (whether or not incorporated, * * * and whether or not affiliated) owned or controlled directly or indirectly by the same interests." The type of control contemplated by these provisions is reflected in the regulations which deal with the concept in all-embracing language as follows (Regulations 111, sec. 22.45–1 (3) ):

> The term "controlled" includes any kind of control, direct or indirect, whether legally enforceable, and however exercisable or exercised. It is the reality of of the control which is decisive, not its form or the mode of its exercise. * * *

It is wholly unimportant that the Goodman trusts which owned stock in National and Industries were not the same Goodman trusts which were the record partners in Hosiery and Abar. The significant thing is that each of the two Goodmans in fact exercised control that was commensurate with the holdings of his family, and that Kobin in fact exercised control commensurate with the holdings of his family. We have no doubt that all four organizations were "owned or controlled directly or indirectly by the same interests." Cf. *Forcum-James Co.*, 7 T. C. 1195, 1215–1216.

3. The existence of the requisite common ownership or control is not sufficient, however, to justify the application of section 45. The Commissioner may make a distribution, apportionment or allocation under section 45 only "if he determines [that it] is necessary in order to prevent evasion of taxes or clearly to reflect the income of such [owned or controlled] organizations, trades, or businesses." The purpose of section 45 is not to punish the mere existence of common control or ownership, but to assist in preventing distortion of income and evasion of taxes through the exercise of that control or ownership. It is where there is a shifting or deflection of income from

one controlled unit to another that the Commissioner is authorized under section 45 to act to right the balance and to keep tax collections unimpaired. *Asiatic Petroleum Co.* v. *Commissioner* (C. A. 2), 79 F. 2d 234, 236, certiorari denied 296 U. S. 645; Treas. Regs. 111, sec. 29.45-1; cf. *Gordon Can Co.*, 29 B. T. A. 272.

It has been said many times that the Commissioner has considerable discretion in applying section 45, and that the determinations required of him under the statute must be sustained unless that discretion has been abused. Our review of those determinations is not *de novo*, and we may reverse them only where the taxpayer proves that they are unreasonable, arbitrary, or capricious. See, e. g., *G. U. R. Co.* v. *Commissioner* (C. A. 7), 117 F. 2d 187, 189; *National Securities Corp.*, 46 B. T. A. 562, 564, affd. (C. A. 3) 137 F. 2d 600, 602, certiorari denied 320 U. S. 794; *Seminole Flavor Co.*, 4 T. C. at 1228.

Applying this standard, we conclude that the allocations of Abar's income were arbitrary as to both Industries and National, that the allocation of Hosiery's income to Industries was reasonable and justified by section 45, and that the allocation of Hosiery's income to National was not authorized by section 45.

a. *Abar.* Abar purchased waste and defective hosiery from Industries and National, as well as from other sources, paying established market prices therefor. It either repaired the hosiery or reclaimed the yarn. In the case of the repaired hosiery, Abar would have it dyed and finished by National, paying standard charges for such services, and would then sell the hosiery to jobbers. The reclaimed yarn it would sell primarily to Industries, National, and Fulton (an organization controlled by the Goodmans), although it made some sales to other purchasers. It received established market prices for its reclaimed yarn. We think that the Commissioner's attempt to make allocations of Abar's income was arbitrary and unauthorized by section 45.

Nor is a contrary conclusion warranted because it was not shown that independent capital was an important factor in Abar's operations, or that it had any employees independently of those of petitioners or some other similarly controlled organization; or because its machinery was owned by petitioners or another similarly controlled organization, and its operations were carried on at the premises of one of those organizations; or because its mended hosiery was finished by National. Cf. *Miles-Conley Co.*, 10 T. C. 754, affirmed on another issue (C. A. 4), 173 F. 2d 958; *Buffalo Meter Co.*, 10 T. C. 83; *Seminole Flavor Co.*, 4 T. C. 1215; *Briggs-Killian Co.*, 40 B. T. A. 895. The area in which Abar operated was a separate and distinct phase of the industry, and it was, moreover, a phase never before entered either by National or Industries. And despite all the intertwining rela-

tionships, the fact remains that Abar paid and received fair market prices, as though its transactions had been carried on with strangers. No more could be expected of it. While the interests controlling Industries and National could have set up salvage departments within those corporations, the uncontradicted testimony was that a single mill usually did not have enough waste to justify such a step, and, in any case, there was no obligation to adopt the course which carried the greater tax burden. Cf. *Central Cuba Sugar Co.*, 16 T. C. 882, at p. 892.

b. *Hosiery*. It is important that Hosiery's position in the scheme of things be clearly understood. Industries had a so-called grey mill at Grenada, Mississippi. It had no facilities for dyeing or finishing its product. It shipped its hosiery in the grey directly to National at Indianapolis, where the hosiery was dyed and finished, at standard prices for such services, which included a fair profit above costs to National. Title to the hosiery remained in Industries. This arrangement was worked out directly between Industries and National as early as April 1938.

Hosiery's predecessor, Knitting, was first organized in March 1938. At some undisclosed time, Knitting entered into an oral agreement with Industries to furnish styling and merchandising services to Industries and to arrange for the sale of Industries' products. Neither Knitting nor Hosiery had any machinery or plant; neither had a sales organization; there is no evidence that either of them had any tangible physical assets of any consequence; the address of both was the same as National's address; neither Knitting nor Hosiery had any employees who were not also officers or employees of Industries or National; the initial capital of Hosiery was fixed at the comparatively nominal amount of $4,286.25, and even that amount was not contributed in cash or assets other than notes. Capital was not a factor in Hosiery's operations which consisted almost entirely, as far as we have been able to determine from this record, of part-time or occasional services rendered by the two Goodmans and Kobin.

The foregoing summary is not intended to suggest that Hosiery should be disregarded as a sham; indeed, we have already concluded that Hosiery's separate entity will be recognized. But it is highly relevant to examine the functions performed by Hosiery in correct perspective, in order to determine whether income that was really earned by Industries has been artifically diverted to Hosiery; and a helpful guide in seeking the answer to that inquiry is whether the charges made by Hosiery for its services were disproportionate to the value of such services.

What was the nature of the services performed by Hosiery? There is no evidence that any of the record partners in Hosiery performed services; we are informed only of services alleged to have been per-

formed by the two Goodmans and Kobin, as employees of Hosiery. Each of these three persons, however, was also actively engaged in the hosiery business as an officer or employee of other organizations, such as National. Thus, National's returns for 1941 state that Kobin devoted full time to its business, and its returns for 1942 disclose that he devoted three-fourths of his time to its business. It is plain that the services of the two Goodmans and Kobin, as employees of Hosiery, were only on a part-time or occasional basis.

These were, nevertheless, valuable services, and included furnishing ideas for design and styling of Industries' product, the establishment of various brand names for that product, as well as the development of other merchandising ideas and plans. In addition, they procured directly several large purchasers for Industries' product, such as Sears, Roebuck & Company. However, apart from the few large purchasers, Hosiery did not, through its employes, do any selling. The great bulk of the sales was made by National's sales organization, and for those services National was paid its costs plus a fair profit. Petitioners contend that Hosiery "engaged" National's services. Certainly, this is not true as to National's services in dyeing and finishing Industries' hosiery, for, by contract of April 12, 1938, National agreed directly with Industries to perform such services for Industries. And although Hosiery may have gone through the formality of "engaging" National's sales organization, we think it contributed nothing of value to Industries in that respect, for Industries could have arranged that matter directly with National, just as it had made direct arrangements with National to dye and finish its hosiery.

Petitioners contend that this is an inappropriate case for the application of section 45, since Industries received a fair price for its hosiery in the grey. But the fatal defect of that contention is that Industries did not sell its hosiery in the grey. Had Hosiery purchased Industries' product in the grey, thereby assuming all responsibility as well as the risk of the market from that point forward, there would be substance to that position. But that was not the case. Industries manufactured hosiery in the grey; it shipped the hosiery to National for dyeing and finishing, for which it paid standard charges; and it at all times retained title to its product. Hosiery did render styling and merchandising services, as well as sales services in the case of a few large purchasers. But Hosiery did not buy Industries' product for resale. Nor did it guarantee that Industries would receive any fixed or minimum return on its product. It was Industries' finished product that was being sold to the trade, not the product of Hosiery. And it is wholly fallacious to contend that Industries was entitled to receive only a fair price for its hosiery in the grey. It was entitled to receive the full price paid for its finished

product minus such fair charges as may have been incurred for dyeing, finishing, and sales services furnished by National, and minus also such fair charges for styling, merchandising, and other services actually rendered by Hosiery. To the extent that the arrangement between Hosiery and Industries resulted in a larger concentration of profits in the hands of Hosiery, to the detriment of Industries, this case presents a typical situation for the application of section 45.

What, then, was the fair value of the services rendered by Hosiery? As we have indicated above, the partnership, as such, furnished nothing of value to Industries, apart from the services of the two Goodmans and Kobin—services which Industries could have engaged directly, if Hosiery (or its predecessor, Knitting) had not been created. However, Hosiery was entitled to receive the fair value of the services rendered by the two Goodmans and Kobin as its employees. The evidence as to that value was not entirely satisfactory, and the best measure we can find, in the evidence before us, of the value of those services is the salaries that were in fact paid for them. Cf. *Welworth Realty Co.*, 40 B. T. A. 97, 100–101. There was testimony that those salaries were fixed by agreement with the Goodmans and Kobin; that they participated in determining the amounts of the salaries; that in fixing those salaries they considered the reasonable value of their services; and that the salaries as fixed were considered fair compensation.

It may be that the amounts of these salaries were in some way affected by the fact that the employer, Hosiery, was controlled by the employees, the Goodmans and Kobin, and that its profits would directly or indirectly benefit them or persons closely related to them. The fact that the salaries declined in later years is not enough to establish that any special concession was made; another plausible explanation for the decrease appears in the evidence. L. L. Goodman testified that the major merchandising job came in the earlier years, with the task of establishing a market for Industries' product, and that "once the brand got established and the public repeated on it, it from then on went on its own momentum." In the later years, therefore, the Goodmans' and Kobin's services were reduced, and a reduction in their compensation was not at all surprising. This, in substance, seems to be affirmed by petitioners in their brief, where they say that "These compensations were not in the category of 'salaries' for continuing services, which ordinarily are more or less uniform through the years."

In any event, the burden was on Industries to prove the value of the services Hosiery rendered, and it has provided no more convincing evidence of that value than the salaries in question. Petitioners insist that once they have shown application of section 45 and the allocations thereunder to be arbitrary, the burden shifted to respond-

ent to prove a proper allocation. While there may be doubt as to the validity of this contention, we need not consider it, because we do not believe that Industries can establish that the allocation of Hosiery's income made to it by respondent was arbitrary without showing the value of the services it received from Hosiery.

L. L. Goodman's testimony suggests in a general and undefined fashion that Hosiery's services to Industries extended beyond the mechandising and other services already noted, performed by the Goodmans and Kobin, and that therefore it was not unreasonable for Industries to pay Hosiery more than just the value of those services. We find nothing in that testimony or in other evidence to show exactly what these additional functions were, and we are not convinced that in fact there were any. The claim itself seems to amount to little more than that the experience, interest, and resources of the Goodmans and Kobin were marshalled behind Industries' product. To the extent that this was reflected in the services they rendered, compensation therefor must be taken to be included in the salaries they received. Over and beyond that there was nothing Industries did not already derive from its own connections and relations with the Goodmans and Kobin. Cf. *R. O. H. Hill, Inc.*, 9 T. C. 153, 157–158.

Petitioners challenge the deficiencies on the further ground that the respondent made allocations of Hosiery's "net" income, and not of its "gross" income. Cf. *Chelsea Products, Inc.*, 16 T. C. 840. There is confusion in the record as to the label to be applied to the amounts allocated by respondent. The respondent's deficiency notices, which form the basis for these proceedings, refer to the amounts as "gross" income, whereas reports of a revenue agent, introduced in evidence to show the detailed computations, refer to the amounts as "net" income. We think that respondent's explicit determination in his statutory notices of deficiency that he was allocating "gross" income cannot be reversed, in view of the nature of the transactions carried on between Hosiery and Industries. Hosiery itself neither bought nor sold the product manufactured by Industries, but only provided certain services respecting that product. Therefore, contrary to the manner in which it executed its tax returns, the amounts at which Industries' finished product was sold were not Hosiery's "gross receipts" but those of Industries; Hosiery had no "cost of goods sold," and no "inventory"; and the expense of finishing, dyeing, and selling Industries' product was in fact the expense of Industries and not of Hosiery. Hosiery's returns, which were based upon the theory that it sold its own goods, were therefore misleading. In fact, other than the salaries paid by Hosiery and some small tax liability,[5] it is not clear that

---

[5] Hosiery's tax returns claimed deductions for taxes for its fiscal years ending in 1941, 1942, 1943 and 1944 in the following respective amounts: $413.21, $550.18, $618.05, $724.80. Except for $3.21 for state personal property tax in the 1941 return, these amounts consisted of social security taxes and state gross income taxes.

Hosiery had any expense of operation. We approve an allocation of Hosiery's gross income to the extent that such gross income in fact exceeded the fair value of the services rendered by Hosiery to Industries, and we think that, in essence, respondent did substantially that here (after making an allowance of a 10 per cent return on the partners' capital). The deficiencies proposed against Industries are no greater than they would have been, had Hosiery filed returns which accurately set forth its gross income and had the Commissioner made explicit allocations of portions of those amounts—allocations which we approve. In the circumstances, we find no error in the proposed deficiencies against Industries.

However, the Commissioner did more than make an allocation of a portion of Hosiery's income to Industries; he also allocated a portion thereof to National. We think that action was unauthorized by section 45. National received a fair price, including a reasonable profit, for the dyeing, finishing, and sales services which it rendered with respect to Industries' product. Thus, National's earnings in relation to such services were accurately reflected in its returns, and there is no basis on which to attribute to National any further profits growing out of the sale of Industries' product. We therefore disapprove the deficiencies asserted against National to the extent that they reflect allocations from Hosiery.

*Decisions will be entered under Rule 50.*