**RAYMOND PEARSON MOTOR COMPANY and Raymond Pearson, Inc., Petitioners,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 16306.**

United States Court of Appeals Fifth Circuit.

June 28, 1957.

William O. Taylor, Houston, Tex., Butler, Binion, Rice & Cook, Houston, Tex., of counsel, for petitioners.

Meyer Rothwacks, Helen A. Buckley, I. Henry Kutz, Ellis N. Slack, Lee A. Jackson, Attys., Dept. of Justice, Washington, D. C., Charles K. Rice, Asst. Atty. Gen., Dept. of Justice, John Potts Barnes, Chief Counsel, John M. Morawski, Sp. Atty., Internal Revenue Service, Washington, D. C., for respondent.

Before HUTCHESON, Chief Judge, and TUTTLE and JONES, Circuit Judges.

JONES, Circuit Judge.

For over fifteen years prior to 1946 Raymond Pearson was an automobile dealer in Houston, Texas, handling Ford cars in one division of his business and Lincolns and Mercurys in another. This business was then wholly owned by Raymond Pearson. He handled used cars, parts and accessories, made repairs and rendered related services. In 1939 Raymond Pearson entered into a partnership with his two sons, Raymond Pearson, Jr. and Robertson Pearson under the name of Raymond Pearson and Sons. The partnership agreement recited the partnership purposes to be the handling of Ford tractors and Ferguson farm implements and the financing of the sale of automobiles, particularly those sold by Raymond Pearson. Each partner had a third interest in the business, and profits and losses were to be shared equally.

Customarily, automobile dealers dispose promptly of their time sale paper. Finance companies such as Universal C.I.T. Credit Corporation and Pacific Finance Corporation make a business of purchasing and handling such paper. It is usual for the finance companies to furnish forms for the use of the automobile dealers who do business with them. In the execution of one of these forms the automobile purchaser will generally agree to pay the price of the car less the down payment or trade-in, or both, plus a "Time Sales Charge" and sometimes other items such as insurance. The so-called time sales charge includes interest. The aggregate of these amounts is payable over an agreed period in installments by the automobile purchaser. The automobile dealer receives from the purchaser of the time sale pa-

per that portion of the amount which represents the unpaid balance of the price of the car. The transfer from the automobile dealer is made by an assignment or endorsement in which the transferor warrants the genuineness of the instrument, the legal capacity of its maker, the delivery of the car described, the accuracy of the description, the title to the car, and the correctness of the amount stated as owing. Written agreements are made between finance companies and those from whom they purchase installment paper. These agreements provide the basis upon which the paper would be sold and handled. The transferor of the paper, usually an automobile dealer, agrees to purchase from the finance company each car which the finance company shall repossess and pay the finance company an amount equal to the balance unpaid on the time sale instrument. The agreements also contain provisions for a dealer's reserve allowance. Such provisions set forth formulae under which the finance company shares the time sales charges with those from whom it purchases secured installment paper. Under such arrangements Raymond Pearson disposed of his time sale paper prior to 1940. During some of these years Raymond Pearson suffered losses on the repossessed cars which he was required to purchase from finance companies. The partnership, Raymond Pearson and Sons, made an agreement with Raymond Pearson as of January 1, 1940, by which Raymond Pearson agreed to sell and the partnership agreed to buy, at face value, all notes and other time sale obligations received by Raymond Pearson in the sale of automobiles. Raymond Pearson agreed to handle the preparation for sale and the selling of cars which were repossessed. The partnership agreed to pay Raymond Pearson all costs of repairing and selling repossessed cars, and to pay all losses incurred in the sale of repossessed automobiles. The partnership was active in the tractor and implement business until that business became a war casualty in the latter part of 1941.

At various times the partnership has invested in mineral properties and dealt in war surplus goods. The arrangement by which the partnership financed the term sales of automobiles by Raymond Pearson continued through 1945.

In January, 1946, two corporations were organized, Raymond Pearson Motor Company which took over Raymond Pearson's Mercury and Lincoln business, and Raymond Pearson, Inc. which acquired the Ford dealership. Both corporations deal in used cars, parts and accessories and render repair and other related services. Raymond Pearson owned sixty per cent. and each of his sons owned twenty per cent. of the stock of each corporation. On January 14, 1946, each of the corporations entered into a contract with the partnership having identical provisions as the 1940 agreement between Raymond Pearson and the partnership. On January 1, 1949, each corporation made a supplemental agreement with the partnership. By these agreements the partnership appointed the corporations as agents to endorse and deliver notes and other automobile paper which were the subject of the 1946 agreements, to Universal C.I.T. Credit Corporation, or to Pacific Finance Corporation, or to any other person or corporation with whom the parties might choose to do business. These agreements confirmed an established practice under which the corporation selling cars and taking the time sale paper would transfer the paper direct to Universal C.I.T. or to Pacific Finance, or occasionally, to some other finance company. These transfers were made for the account of the partnership pursuant to the 1946 agreement. One of the purposes of making direct transfers of the paper from the Pearson corporations to the finance companies, perhaps the dominant purpose, was to avoid taxes which would otherwise be payable to the State of Texas.

Both Universal C.I.T. and Pacific Finance knew of the agreements between the corporations and the partnership, and agreed to look to the partnership,

but not to the corporations, to discharge all of the obligations arising under the warranties contained in the assignments or endorsements of the time sale paper. These finance companies recognized the obligation of the partnership under the agreements to purchase repossessed cars, and they recognized that the partnership was entitled to receive the payments from the dealers' reserve accounts. On the books of Pacific Finance the dealers' reserve accounts were carried in the name of the partnership and checks in payment of dealers' reserve income were made by Pacific Finance to the partnership. Universal C.I.T. carried the dealers' reserve accounts in the names of the two corporations. Most of its checks were made to the partnership. Occasionally the payee in a check from Universal C.I.T. would be one of the corporations or Raymond Pearson individually. Occasionally, some time sale paper would be sold to a finance company other than Universal C.I.T. or Pacific Finance. Remittances from these other companies generally came to one of the corporations or to Raymond Pearson. All dealers' finance reserve funds received by Raymond Pearson or the corporations were turned over to the partnership. The dealers' reserve income received by the partnership and arising out of time sale instruments originating with Raymond Pearson Motor Co. during its fiscal year ending September 30, 1949, was $8,877.-90. The amount received arising out of time sale instruments originating with Raymond Pearson, Inc. during the same period was $16,375.26. This income was included as taxable income by the partnership in its Federal tax return. The Commissioner determined that these items were taxable income to the corporations. The Tax Court, in a Memorandum Opinion, held that for tax purposes the partnership was a mere sham and device, that the corporations performed all of the business transactions incident to earning the dealers' reserve income although ostensibly acting as agents for the partnership, that the partnership functioned only to receive and report the dealers' reserve income, that economic conditions were such that repossessions of automobiles would be unlikely, and that no business purpose was served by the arrangements between the corporations and the partnership. In the Tax Court's opinion, there was no question but that all of the dealers' reserve income flowed from the efforts of the corporations. The Commissioner's determinations were approved and the Tax Court entered its decisions against the corporations. Those decisions are before us for review.

The definition of "gross income" is extremely broad. It reads:

"(a) General definition. 'Gross income' includes gains, profits, and income derived from salaries, wages, or compensation for personal service, * * * of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever." 26 U.S.C.A., I.R.C.1939, § 22(a).

The determination that the dealers' reserve income was taxable to the corporations was made pursuant to the following provision of the Internal Revenue Code:

"In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Commissioner is authorized to distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or

allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses." 26 U.S.C.A., I.R.C.1939, § 45.

The Tax Court "found as a fact" that the services incident to the determining of the dealers' reserve income were performed by the corporations and it held that the amounts received were income to the corporations under § 22(a) of the Internal Revenue Code of 1939. It was the opinion of the Tax Court that there was no question but that all of the dealers' reserve income flowed freely from the efforts of the corporations and their employees. In support of this statement the Tax Court cites R.O.H. Hill, Inc. v. Commissioner, 9 T.C. 153, and Forcum-James Co. v. Commissioner, 7 T.C. 1195. The Hill case was one of the principal precedents relied upon by the Tax Court in Grenada Industries, Inc. v. Commissioner, 17 T.C. 231, which was affirmed by this Court. Grenada Industries, Inc., v. Commissioner of Internal Revenue, 5 Cir., 1953, 202 F.2d 873. The Forcum-James case was settled by compromise while on appeal. Forcum-James v. Commissioner, 6 Cir., 1949, 176 F.2d 311.

The Tax Court stated that when the agreements were made between the partnership and the corporations in 1946, it was obvious that there would be no likelihood of losses from repossessions and it rejected the claim of the taxpayer corporations that there was a business purpose for the arrangement effected by the agreements. The 1946 agreements came into operation when the corporations took over the automobile sales and service businesses formerly operated by Raymond Pearson, and carried on the arrangement for handling the time sale paper that previously existed between him and the partnership. During several of these years repossession losses were sustained. The finance companies which ultimately acquired the installment paper could have taken it, or at least some of it, without any agreement for the purchase of repossessed cars. Where the finance companies acquired the paper

with an agreement for the purchase of repossessed cars, the dealers' reserve income was greater than where there was no obligation for the purchase of repossessions. This obligation to purchase was the undertaking, not of the corporations, but of the partnership. The assumption of this liability by the partnership, upon its credit and the credit of the partners, was a contributing factor in the production of the reserve income. Something more was involved than transfer of the time sale paper and the execution of instruments incident to such transfers. The partnership was in the business of handling installment paper before the corporations were formed. Although the corporations could have embarked upon this phase of business activity they did not do so.

█ With respect to that which was "found as a fact" by the Tax Court it may be said, as was said by the Second Circuit:

"The facts are not in dispute, for the argument is plainly untenable that the Tax Court's declaration that the income from the three businesses 'was the income and property of Airco as principal,' was a finding of fact; on the contrary, that was exactly the issue on which the whole case turned." Commissioner of Internal Revenue v. National Carbide Corp., 2d Cir., 1948, 167 F.2d 304, 307, affirmed 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779, cited in Friedlander Corp. v. Commissioner of Internal Revenue, 5 Cir., 216 F.2d 757.

Whether the issue be a question of law or one of ultimate fact reached by processes of legal reasoning from, or the interpretation of the legal significance of, the evidentiary facts, which are here undisputed, that issue can be considered and decided on appeal free from the restraint of the so-called "clearly erroneous" doctrine. Galena Oaks Corporation v. Scofield, 5 Cir., 1954, 218 F.2d 217. Cf. Benton v. Commissioner of Internal Revenue, 5 Cir., 1952, 197 F.2d 745.

The Commissioner cites Grenada Industries, Inc., v. Commissioner, 17 T.C.

231, affirmed 5 Cir., 1953, 202 F.2d 873, for the proposition that, while § 22(a) cannot be used to disregard actual entities, it can be used to charge income to the taxpayer who earned it, and § 45 can be used to allocate income of businesses under common control in order to reflect clearly the income of any such organizations. There is no question as to the soundness of this principle. The Grenada case involved two corporations and two partnerships, owned and controlled by the same interests. The Tax Court rejected the Commissioner's effort to tax to the corporations, hosiery manufacturers, the earnings of a partnership which purchased from the corporations defective hosiery, repaired and sold the repaired hosiery to jobbers, or reclaimed the yarn and sold it to one of the corporations, notwithstanding the fact that such operations were related to the business of and might have been performed by the corporations. The other partnership rendered services in styling and selling the product of one of the corporations and to the extent the compensation paid was excessive an allocation made pursuant to § 45 was approved.

Pertinent to the problem here is language in the Tax Court's Grenada Industries opinion from which we quote:

"The existence of the requisite common ownership or control is not sufficient, however, to justify the application of section 45. The Commissioner may make a distribution, apportionment or allocation under section 45 only 'if he determines [that it] is necessary in order to prevent evasion of taxes or clearly to reflect the income of such [owned or controlled] organizations, trades, or businesses.' The purpose of section 45 is not to punish the mere existence of common control or ownership, but to assist in preventing distortion of income and evasion of taxes through the exercise of that control or ownership. It is where there is a shifting or deflection of income from one controlled unit to another that the Commissioner is authorized under section 45 to act to right the balance and to keep tax collections unimpaired." Grenada Industries, Inc., v. Commissioner of Internal Revenue, 17 T.C. 231, 254.

In the Friedlander Corporation case, supra, the corporation which owned a number of mercantile stores transferred some of the stores to a newly organized partnership created by the stockholders of the corporation. The main offices of the corporation and the partnership were at the same location and the books of both were there maintained by the same personnel. The corporation paid all of the rent and all of the salaries of office employees. The Commissioner determined and the Tax Court, 19 T.C. 1197, found that the partnership was a sham created to siphon off corporate profits to avoid income tax. The corporation, conceding that tax reduction was one of the reasons for the forming of the partnership, contended that the organization of the partnership was to prevent quarrels among management personnel resulting from conflicting views as to operating policies. The Tax Court concluded that the primary motive for forming the partnership was to reduce tax liability and affirmed the Commissioner's inclusion of partnership earnings as corporation income. This Court reversed. In the opinion of the Court it was there said, as it might here be said, that the Tax Court

" * * * rejecting the stipulated and undisputed facts that the partnership was formally created and activated, and for years carried on a large business, and seizing, as determinative of the question at issue, upon the admitted fact that the partnership was formed because of the advice of a tax accountant and consultant that there would be less liability if the stores were owned by a partnership, and stating: 'The primary motive for forming the partnership was to reduce tax liability', concluded in the teeth of the overwhelming, indeed undisputed, oral and physical evidence to the contra-

ry, that 'The parties did not in good faith and acting with a business purpose intend to join together as partners in the present conduct of an enterprise'. So concluding, and without a syllable of evidence or a real fact to the contrary, it erroneously declared and held that the large income in fact earned by the partnership and its members throughout the years was not earned by it but by the petitioner and was, therefore, taxable not to the partnership but to it.

"Saying, and thus giving lip service to the settled rule of law, 'that a taxpayer may select any form of organization through which to conduct business and is under no compulsion to adopt a type that will yield the greatest amount of tax revenue', and again, 'Louis, the architect of the plan, testified, in effect, that taxation was the predominant motive for creation of the partnership. Such a purpose, if the plan for its accomplishment is not unreal or a sham, is of course not fatal. * * *', the majority proceeded by the same kind of unpermissible fiating which has been condemned in the cases, to attribute to petitioner income earned not by it but by the partnership." Friedlander Corp. v. Commissioner, 5 Cir., 1954, 216 F.2d 757, 759.

■ As we have noted, the partnership was in business before the corporations came into existence and dealers' reserve income had never been included in the earnings of the corporations. The conduct of the partnership business at the offices of one of the corporations does not establish that the partnership was sham. The activities of the partnership in the financing of time sale paper constituted a separate and distinct phase of the marketing of automobiles. The dealers, the corporations, were not, as the Tax Court has said, "required to adopt or continue with that form of or-

ganization which results in the maximum tax upon business income". Polak's Frutal Works, Inc., v. Commissioner, 21 T.C. 953, 973, cited in Friedlander Corp. v. Commissioner of Internal Revenue, supra.

■ The Commissioner's allocation of partnership income to the petitioner corporations was arbitrary and unauthorized. The decision of the Tax Court sustaining the Commissioner is erroneous. The parties have stipulated as to the amount of tax deficiencies in the event the dealers' reserve income is taxable, as we hold it is, to the partnership. For the entry of appropriate decisions pursuant to the stipulation, the judgment of the Tax Court is

Reversed and Remanded.

HUTCHESON, Chief Judge (concurring).

I am in complete agreement with the views expressed in the majority opinion and would content myself with noting my concurrence but for the fact that the dissenting opinion appears to me to proceed upon an assumption which, with deference, neither Section 45 nor the construction and application of it in the cases warrant.

Because of this assumption which, as I understand it is that there is something about the determination of the commissioner under this section which makes it almost, if not quite, sacrosanct and unreviewable, and that the decision of the Tax Court approving it cannot be set aside on the ground that it is clearly erroneous, I thus briefly state my views.

Having its genesis in the consolidated returns provisions of Sec. 240(d) of the Revenue Acts of 1921 and 1924, 26 U.S. C.A., Sec. 993 note,[1] and Sec. 240(f) of the Revenue Act of 1926, 26 U.S.C.A. Sec. 993(f), that section was designed to frustrate abuses of misallocation of gross income by authorizing the commissioner to allocate it where necessary to prevent the evasion or avoidance of taxes. Asiatic Petroleum Co. (Delaware) Limited v. Commissioner, 2 Cir., 79 F.2d

1. 1928 Edition rule.

234. It was not intended to give, it did not have the effect of giving the commissioner authority by fiat to allocate to one income which was really not his income but that of another. Nothing in the statute, nothing in the decisions supports the view that the commissioner's determination under this statute is not subject to court review, just as his other determinations are. On the contrary, while the decisions do declare that congress has placed broad discretion in the commissioner and that a court cannot substitute its judgment for his unless that discretion has been abused, G. U. R. v. Commissioner, 7 Cir., 117 F.2d 187, 188, National Securities Corp. v. Commissioner, 3 Cir., 137 F.2d 600, it is well settled that his determination, "that such distribution, apportionment or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any such trades or businesses", must be based upon evidence reasonably supporting it, and that, notwithstanding its approval by the Tax Court, this court may set it aside if of the opinion that the determination was clearly erroneous.

In Grenada Industries, Inc., v. C. I. R., 5 Cir., 202 F.2d 873, referred to in the dissenting opinion, this court did not intend to hold, it did not hold, that it was bound by the commissioner's finding and allocation and approval of it without regard to the facts. On the contrary, the court took pains to say that the *Tax Court had correctly analyzed the facts and has correctly applied the law to them.* We did not intend to say, we did not say, that the review by the Tax Court and the appeal to this court were mere futile gestures for want of power in the Tax Court to review the determination of the commissioner and in this court to review that of the tax court, as would be the case if the dissenting opinion is a correct statement of the law.

With respect to the view of the dissenting judge that we have come full cycle around since the Dobson case, Dobson v. C. I. R., 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248, in my opinion, an unwarranted piece of judicial legislation, it is sufficient to say that fortunately, with the aid of Congress, we have, and that under 26 U.S.C.A. § 7482 courts of appeals now have exclusive jurisdiction to review the decisions of the tax court in the same manner and to the same extent as decisions of district courts in civil actions tried without a jury. Nothing in the reasons for the enactment of this statute, nothing in the statute, supports or suggests what the dissenting opinion would read into it, that when the matter to be reviewed has to do with a determination under Sec. 45, the statute for review does not apply.

With the view of the dissenting opinion that the facts support the commissioner's determination and because they do our reversal of the commissioner's determination is wrong, I cannot of course quarrel. I can only say that I do not agree with its premise, and that if I could, I would of course agree with the conclusion.

TUTTLE, Circuit Judge (dissenting).

Because of the implications which I think inhere in a reversal of a decision of the Tax Court which affirms a determination in which the Commissioner is given wide discretion, I must respectfully dissent from the opinion of the Court.

The scope of section 45 has been dealt with by this Court in the case of Grenada Industries, Inc., v. Commissioner of Internal Revenue, 5 Cir., 202 F.2d 873, 874. In that case in an opinion written by Chief Judge Hutcheson, it was said:

"A careful examination of the Tax Court's thorough and painstaking analysis of the facts and its equally thorough discussion and exposition of the meaning and effect of Sec. 45, as applied to the facts of this case, convinces us that the facts have been correctly apprehended and stated and the law as correctly applied to them."

In that case the Tax Court said:

"It has been said many times that the Commissioner has considerable

discretion in applying Section 45, and that the determinations required of him under the statute must be sustained unless that discretion has been abused. Our review of those determinations is not de novo, and we may reverse them only where the taxpayer proves that they are unreasonable, arbitrary, or capricious. See e. g., G. U. R. Co. v. Commissioner, 7 Cir., 117 F.2d 187, 189; National Securities Corp., 46 B.T.A. 562, 564, aff[irme]d 3 Cir., 137 F.2d 600, 602, certiorari denied 320 U.S. 794 [64 S.Ct. 262, 88 L.Ed. 479]; Seminole Flavor Co., 4 T.C. [1215], at 1228." Grenada Industries, Inc., v. Commissioner of Internal Revenue, 17 T.C. 231, 255.

Having accepted the law as laid down by the Tax Court in the Grenada case as we did, as indicated by the first quotation above, it must be conceded, I would think, that when such a finding by the Commissioner is fortified by a decision by the Tax Court a fortiorari the matter comes to us with considerably more dignity and standing than if we were attempting de novo to determine what allocation would appear to us to be proper as between the related taxpayers. Thus while it is true as stated in the majority opinion that the determinations made by the Tax Court in this case are not inviolate as are findings of fact by a jury or as being reversible only upon a determination by us that the decision of the Tax Court is clearly erroneous, we are not at liberty to substitute our judgment for that of the Commissioner as affirmed by the Tax Court merely because we would have initially decided the matter differently ourselves.

As to whether, then, we can say that the Commissioner's allocation was unreasonable, arbitrary or capricious, we must look at the facts. To support its finding that the income here involved was really the income of the corporations rather than of the partnership made up of the corporations' stockholders, the Tax Court had in the record before it the following facts: Although having been engaged in the automobile business prior to 1941, Mr. Pearson and one of his sons were in the Army through 1945 and as Mr. Pearson stated in his testimony: "We were out of the automobile business you might say from 1942 to 1946." In January, 1946, Pearson and his two sons organized two corporations to sell Ford and Lincoln automobiles respectively. There was in existence a partnership consisting of the same three persons which prior to 1941 had had a contract under which it agreed to buy all of the automobile paper covering automobiles sold by Mr. Pearson individually. This partnership was engaged in 1946 in making investments and in buying and selling war surplus. In March, 1946, contracts were signed and dated back to January 16, 1946, under the terms of which the two corporations agreed to sell to the partnership and it agreed to buy from the two corporations all of the corporations' automobile paper. In the interim between the date on which these contracts were signed and the date which they bore on their face, therefore before they were in existence, the two corporations had executed in their own names financing agreements with the two finance companies called Retail Protection Agreement for Automobile Dealers. Under the terms of these contracts the two dealer corporations undertook to sell to C.I.T. and Pacific automobile paper, and one of the terms of the contracts provided for the creation of the dealer's reserve which is here in controversy. During the years 1946 through 1949 every piece of automobile paper representing an automobile sold by the two corporations was transferred directly by endorsement by the corporations named to either C.I. T. or Pacific or some other finance company (a relatively small number of cases). In no case was any paper endorsed by either corporation to the partnership or by the partnership to C.I.T. or Pacific. The partnership never paid a dollar for any of the paper. Although it was testified by Pearson without fully indicating whether he was speaking as president of one of the corporations or as a partner

in the partnership that he had an "agreement" or an "understanding" with local agents of C.I.T. and Pacific, that they would look only to the partnership and not to the corporations for the carrying out of the agreement to repurchase all repossessed cars, and although Pearson testified that he sent a copy of the agreement with the partnership to each of the finance companies, no written agreement of any kind existed whereby the partnership undertook to assume these formal written obligations of the companies, and no written agreement existed whereby the finance companies agreed to ignore the written obligations of the corporations. It was not until September 6, 1950, after the end of the tax year in question, that a new retail protection agreement was executed with the finance companies under the terms of which it was stated that Raymond Pearson, Inc. acted as the authorized agent of Raymond Pearson & Sons, a partnership, in the execution of the agreement.

Raymond Pearson testified that he acted, when the company endorsed paper over to the finance companies, on behalf of the partnership. He stated that he followed this procedure in order to evade a 1$\frac{1}{10}$ percent sales tax which was due the state of Texas on every transfer of a chattel mortgage. It was also apparent that the registration documents filed with the state of Texas did not speak the truth if the court were to accept Pearson's testimony that the paper actually belonged to the partnership at a point of time between its acquisition by the corporation and its transfer to the finance companies.

In the Grenada case which, as we have shown above, this Court accepted as setting forth the law in the application of Section 45, the Tax Court stated the principle that in reallocating income the Commissioner should recognize the fair value of the services of the entity whose claimed income the Commissioner seeks to reallocate. Here the Commissioner

found that services performed by the partnership were non-existent. The taxpayers contend and the majority of the Court agrees that the interposition of the partnership's financial worth when it orally assumed the corporations' obligations to repurchase from the finance companies all repossessed cars amounted to a sufficiently valuable service for this Court to hold that the Commissioner was capricious or arbitrary or unreasonable in disregarding it. I think it clear that since everybody knew that in 1949 there had been no repossessions for three years and that such financial strength would in fact not be needed, and since obviously the oral assurance by the partnership that it would assume the written obligation of the corporations was one which it could under the Texas Statute of Frauds ignore at its own election, and since it is perfectly clear that the finance companies would have a perfectly valid legal right to hold the corporations to the precise terms of their own written agreement since they would not be permitted to vary them by parol testimony to the effect that there was a side understanding that they would not be enforced,[1] both the Commissioner and the Tax Court had ample basis for saying that the partnerships' contribution of services in this situation was non-existent.

If the opinion of the majority of the Court correctly states the law in a situation where the statute expressly gives to the Commissioner broad powers, then we shall indeed have come full cycle since Dobson v. C. I. R., 320 U.S. 489, 64 S.Ct. 239, 246, 88 L.Ed. 248, was decided by the Supreme Court. Of course the Dobson rule—"The jurisdictional function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body"— was superseded by the amendment to the Internal Revenue Code which, now contained in 26 U.S.C.A. § 7482, provides that the Courts of Appeals shall have exclusive jurisdiction to review the deci-

---

1. This is not an effort to apply on behalf of the Government the Statute of Frauds or the parol evidence rule. It is relevant to ascertain just how valuable a financial guarantee the partnership should receive consideration for.

sions of the Tax Court in the same manner and to the same extent as decisions of the District Courts in civil actions tried without a jury. Nevertheless the law in this Circuit, as expressed in the Grenada case, requires that before we reverse a decision of the Tax Court upholding the Commissioner in the exercise of his power of reallocation of income, we must find that the Commissioner's determination was "unreasonable, arbitrary, or capricious," and that the Tax Court's affirming of such determination was equally so.

Far from being unreasonable, arbitrary, or capricious I think there was ample basis for the Commissioner's determination and that the Tax Court's decision should be affirmed.

