**Stanley M. DIEFENTHAL et al.**

v.

**UNITED STATES of America.**

**SOUTHERN SCRAP MATERIAL CO., LTD.**

v.

**UNITED STATES of America.**

**Civ. A. Nos. 70–3582, 70–3583.**

United States District Court,
E. D. Louisiana.

Nov. 20, 1973.

---

A. J. Schmitt, Jr., Beard, Blue, Schmitt & Treen, New Orleans, La., for plaintiffs.

Michael D. Cropper, Tax Division, Dept. of Justice, Dallas, Tex., for defendant.

JACK M. GORDON, District Judge:

In this tax case the Commissioner of Internal Revenue utilized section 482 of the Internal Revenue Code of 1954, 26 U.S.C. § 482 (1970), to allocate net income of $161,753.53 for the tax year 1966 from a foreign corporation, which is exempt from United States income tax, to a domestic corporation, Southern Scrap Material Co., Ltd. (hereinafter referred to as Scrapco), which is subject to tax. In addition, the Commissioner found that the foreign corporation's sole shareholder, Stanley M. Diefenthal (hereinafter referred to as Stanley), who is also a shareholder of Scrapco, received a constructive dividend in the amount of such allocated income. Following payment of the assessed tax and denial of their claims for refund, Scrapco and Stanley, along with the latter's wife, filed suits against the United States in this Court seeking tax refunds on the theory that the Commissioner improperly allocated the income from the foreign corporation to Scrapco. The cases were consolidated for trial without a jury. Because the Court finds overwhelming evidence presented at trial to support the taxpayers' allegations, judgment is rendered in favor of Scrapco and the Diefenthals.

Scrapco was organized around the turn of the century by Stanley's father, Adolph Diefenthal (hereinafter referred to as Adolph). Since its inception and until 1965, when Adolph and his wife died, Scrapco was wholly owned by Adolph. Under the terms of their wills, one-third of the stock of Scrapco passed to Stanley, and approximately one-third passed to each of Stanley's two sons. Stanley was named as executor under the wills, and also was named as trustee of the stock interests which passed to Stanley's two sons.

The corporation engaged in the business of purchasing, processing and selling scrap metal. As the business devel-

oped, Scrapco received orders from Japanese steel manufacturers, which required Scrapco to deliver the scrap to a port or ports in Japan. In order to fix the cost of each such shipment in advance, Scrapco established an unvarying policy of chartering vessels only on a *voyage charter* basis, at a set amount for the trip, from the company's headquarters in New Orleans to the port of destination in Japan. Under the voyage basis of charter, Scrapco's cost of transportation of the steel would not vary in the event unforeseen difficulties resulted in a trip of a duration longer than anticipated. Stanley tried to persuade his father that Scrapco should hire vessels on a *time charter* basis, and thereby realize considerable savings if the trip proceeded without any incident causing delay. He was, however, unsuccessful in convincing his father that the company should assume the risks incident to time chartering vessels, because of his father's adamantly expressed belief that the scrap business with which he was familiar should not become intertwined with the unknown dangers of the shipping business.

Notwithstanding his father's refusal to permit Scrapco to enter the shipping business, Stanley, beginning in the mid 1950's, did go ahead and form his own domestic corporations, which time-chartered vessels and then in turn voyage-chartered the vessels to Scrapco. Thus Stanley's capital assumed the risk of delayed shipment and profited to the extent the trips were completed without incident.

In the early 1960's Stanley set up a Panamanian corporation, Fukaya Trading Company, S.A. (hereinafter referred to as Fukaya) for the purpose of establishing a brokerage agency in Japan to solicit and handle business for Scrapco in return for a commission of one percent of sales. This corporation had an office in Japan and employed three to six employees. It used the trade name of "Southern Scrap Far East, Ltd." It was formed to act as agent for Scrapco in Japan because

of unsatisfactory results achieved by independent agents used prior thereto.

Eventually Stanley liquidated the aforesaid domestic corporations which had engaged in the time chartering business, and properly reported any income realized on such liquidations as capital gain. *See*, I.R.C. sections 331, 1221, 26 U.S.C. §§ 331, 1221 (1970). Then he began using Fukaya, under the trade name of Compania Transporte Arroyo (hereinafter referred to as CTA), to handle the time charters previously handled by his domestic corporations. This had a dual tax advantage. The income from time charters became exempt from United States taxation as long as it was retained in the foreign corporate entity. I.R.C. section 883(a)(1), 26 U.S.C. § 883(a)(1) (1970) (exempting earnings derived from the operation of a ship documented under the laws of a foreign country). *See also,* I.R.C. section 954(b)(2), 26 U.S.C. § 954(b)(2) (1970) (excluding foreign shipping from the definition of "foreign base company income" for purposes of saving American shareholders from any obligation to report income under Subpart F). *See generally,* B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, ¶17.05, at 17–21 (1971). Furthermore, because the ship chartering income accounted for more than seventy percent of Fukaya's total income, the sales income from the brokerage office in Japan was similarly exempt until actually distributed to an American shareholder. I.R.C. section 954(b)(3)(A), 26 U.S.C. § 954(b)(3)(A) (1970).

A problem arose when Japanese officials refused to allow Fukaya, as a foreign corporation, to operate its sales office under an assumed trade name. Accordingly, upon advice of a Japanese consultant, Stanley formed a Panamanian subsidiary of Fukaya, Southern Scrap Far East, Ltd., S.A., and then registered its name in Japan. As indicated by correspondence among Stanley and his consultants in Japan and an attorney in Panama, Southern Scrap Far

East, Ltd., S.A. was intended to be a corporation in name only, and never functioned as a business entity. The Japanese sales activities continued to be on behalf of the parent, Fukaya. The income always went to Fukaya directly, and expenses were paid by Fukaya directly. Accounting records consistently show the income and expenses, assets and liabilities, as those of Fukaya. Accordingly, Stanley treated the sales income as income of Fukaya in the information returns filed with the United States government, but reported the sales income as income of Southern Scrap Far East, Ltd., S.A. on returns filed with the Japanese government. The manner of reporting in Japan was in accordance with his consultant's advice.

The organizational chart thus looked as follows in 1966:

STANLEY's sons

2/3 owners

Southern Scrap Material Co., Ltd.
(SCRAPCO)—American corporation in the scrap metal business

STANLEY

1/3 owner    sole owner

Fukaya Trading Company, S.A.
(FUKAYA)—Panamanian corporation engaged in brokerage and chartering businesses:

a.  Southern Scrap Far East, Ltd.—trade name for Japanese brokerage business.

b.  Compania Transporte Arroyo (CTA)—trade name for time chartering business.

sole owner

Southern Scrap Far East, Ltd., S.A.
—formed to permit FUKAYA to operate in Japan under name Southern Scrap Far East, Ltd.

---

There can be no question about the status of Fukaya as a corporation of substance deserving recognition for tax purposes as an entity separate from Scrapco. *See,* Peter Pan Seafoods, Inc. v. United States, 9 Cir. 1969, 417 F.2d 670. *See generally,* B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders ¶ 15.06, at 15-23 (1971). Fukaya was a corporate entity pursuing legitimate business purposes through an office, employees, and a consultant in Japan, counsel in Panama, and corporate officers and directors in New Orleans. Accounting statements indicate that Fukaya was a financially strong business with a net worth of $162,580 as of the fisal year ending May 31, 1965, and $214,329 as of the fiscal year ending May 31, 1966. When organized, its sole shareholder was not even a shareholder of Scrapco, and even in 1966, the ownership of Fukaya and Scrapco was not identical. In business pursuits, there was a clear difference in functional activity between Fukaya and Scrapco.

Just as Fukaya was not a sham entity, the chartering arrangements between Fukaya and Scrapco were not sham transactions. During the tax year of

1966 Scrapco signed seven voyage charters with Fukaya. Fukaya had signed time charters with shipowners who supplied the ships to Scrapco, thereby assuming highly speculative risks which add substance to the transactions. When Scrapco signed a voyage charter at a lump sum price, it then had a fixed amount as to the cost of shipping scrap to Japan. This was necessary from its business standpoint in order to calculate profit and determine the advisability of adding to its inventory of scrap, and the price to be paid for any such additions to inventory. Fukaya, by contrast, did not know its cost until the voyage was complete, since the price of a time charter depended on the number of days necessary to complete the trip rather than the distance. The risk assumed by Fukaya was substantial. One expert testified that he would want a potential profit of $40,000 to $50,000 on each trip from New Orleans to Japan in order to assume the risk. Another expert witness explained that the nature of a voyage charter is so different from a time charter that the market for each moves independently and varies considerably. Even though Fukaya profited on all seven voyages in 1966, Fukaya has in fact suffered losses of as much as $70,000 on a previous trip, and it is currently involved in arbitration proceedings with respect to a large potential loss on a later trip.

At the request of some shipowners, Scrapco, in connection with some but not all of the 1966 charters, issued letters to the shipowners with the following guarantee of Fukaya's performance:

> In the event of default by Charterers [FUKAYA], Southern Scrap Material Co., Ltd. [SCRAPCO] unconditionally guarantees all terms, conditions and obligations and the performance of the Charter Party and do [sic] hereby assume full responsibility for payment of hire, bunkers, and/or monies which may become due Owners in performance of this voyage.

As explained by Robert H. Norton of Simpson, Spence & Young, a New York ship brokerage firm which handled time charters for Fukaya, the reason for the guarantee was as follows:

> When we are dealing with corporations that are outside of the United States and/or corporations that are associated with one that is better known, it is frequently the case that the better known or the American corporation would give or issue a letter of guarantee of the performance.

The guarantee by Scrapco did not render the risks to Fukaya illusory, because Fukaya was in fact viewed as the primary obligor on the time charters. As a company with sufficient assets to cover losses and contingent liabilities, Fukaya could be depended upon to shield Scrapco from any obligations on the time charter. Therefore, Scrapco's letter was a mere accommodation which did not alter the substance of the transactions.

Despite the substance of both the corporations and the transactions, the Commissioner utilized Section 482 to allocate all of the net chartering income from Fukaya to Scrapco for the tax year of 1966. The purpose of this statute was to prevent instances where one corporation artificially "milked" the profits of another corporation through "fictitious sales, and other methods." H.R.Rep.No. 2, 70th Cong., 1st Sess. 16–17, 1939–1 (Part 2) Cum.Bull. 384, 395. Section 482, which reads as follows, sets out two prerequisites for any allocation by the Commissioner:

> In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits or allowances between or among such organizations, trades or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the in-

come of any of such organizations, trades, or businesses.

First, two organizations must be controlled by the same interests. Second, the Commissioner must determine such allocation is necessary either clearly to reflect income or to prevent evasion of taxes.

■ With respect to the first prerequisite, that the same interests control both corporations, the statute speaks of control, either "directly or indirectly." Regulation section 1.482–1(a)(3) emphasizes that it is the "reality of the control which is decisive, not its form or the mode of its exercise." *See also,* South Texas Rice Warehouse Co. v. Comm'r, 5 Cir. 1966, 366 F.2d 890, 894, cert. denied, 386 U.S. 1016, 87 S.Ct. 1370, 18 L.Ed.2d 454 (1967); Grenada Industries, Inc. v. Commissioner of Internal Revenue, 17 T.C. 231, 254 (1951), aff'd, 5 Cir. 1953, 202 F.2d 873, cert. denied, 346 U.S. 819, 74 S.Ct. 32, 98 L.Ed. 345 (1953). Stanley was the sole owner of all Fukaya stock. Although in 1966 he owned only one-third of Scrapco's stock, he had power over the other two-thirds through his role as trustee for his sons' shares. Thus, the nature of control contemplated by the statute was evident here through Stanley's ability to vote all stock of both corporations.

■ As for the second prerequisite, in a deficiency letter addressed to Scrapco the Commissioner determined that an allocation of net chartering income of $161,753.53 from Fukaya to Scrapco was "necessary to prevent the evasion of taxes and to clearly reflect your income." Such a determination has, however, been judicially construed as subject to review. The taxpayer may prevail by proving not only that the Commissioner's determination was "unreasonable, arbitrary, or capricious," *Grenada, supra,* 17 T.C. at 255, but also that taxpayer's computation was correct. Baldwin-Lima-Hamilton Corp. v. United States, 7 Cir. 1970, 435 F.2d 182, 185. In response to Judge Tuttle's dissenting opinion in Raymond Pearson Motor Co. v. Commissioner of Internal Revenue, 5 Cir. 1957, 246 F.2d 509, 515, Judge Hutcheson explained the effect of section 482 as follows:

> . . . It was not intended to give, it did not have the effect of giving the commissioner authority by fiat to allocate to one income which was really not his income but that of another. Nothing in the statute, nothing in the decisions supports the view that the commissioner's determination under this statute is not subject to court review, just as his other determinations are. On the contrary, while the decisions do declare that congress has placed broad discretion in the commissioner and that a court cannot substitute its judgment for his unless that discretion has been abused, G.U.R. v. Commissioner, 7 Cir., 117 F.2d 187, 188, National Securities Corp. v. Commissioner, 3 Cir., 137 F.2d 600, it is well settled that his determination, "that such distribution, apportionment or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any such trades or businesses," must be based upon evidence reasonably supporting it, and that, notwithstanding its approval by the Tax Court, this court may set it aside if of the opinion that the determination was clearly erroneous.

The Commissioner's determination deserves respect, but this Court has the responsibility to review the evidence in order to prevent unfair treatment of the taxpayer.

The government conceded before trial that the Commissioner erroneously allocated $58,033.34 too much income to Scrapco, and that, to that extent, taxpayers have been forced to overpay taxes. However, the government still maintains that it was appropriate to allocate the remaining $103,720.19 of the original figure of $161,753.53.

Whether or not such allocation was necessary to reflect clearly the income of Scrapco depends on which corporation earned the income. Here Fukaya cer-

tainly earned some of the income by assuming the risk under the time charters. The only question can be about the amount earned by Fukaya. The primary potential for abuse was in the price Fukaya charged Scrapco under the voyage charters. According to Regulation section 1.482–2(c)(1), it was incumbent upon taxpayers to prove the price reflected an arm's length charge, which is defined in Regulation section 1.482–2(c)(2) as follows:

> For the purposes of this paragraph, an arm's length rental charge shall be the amount of rent which was charged, or would have been charged for the use of the same or similar property, during the time it was in use, in independent transactions with or between unrelated parties under similar circumstances considering the period and location of the use, the owner's investment in the property or rent paid for the property, expenses of maintaining the property, the type of property · involved, its condition, and all other relevant facts. . . .

A recent Fifth Circuit case, Lufkin Foundry & Machine Co. v. Commissioner of Internal Revenue, 5 Cir. 1972, 468 F. 2d 805, 808, followed similar regulations and concluded that an arm's length charge could not be proven by examination of the taxpayer's internal transactions. Instead, the taxpayer must present evidence of what prices unrelated parties would have charged or demanded.

Taxpayers in the present case began with Stanley as a witness to testify concerning the procedures of arranging the charters. When Scrapco made a sale of scrap which necessitated shipment to Japan, Stanley called his broker in New York, the firm of Simpson, Spence & Young, to ask for several quotes on a time charter for a ship of sufficient size to depart New Orleans and unload at a port in Japan. The agent later would call Stanley and recite the quotes. The prices could vary considerably depending on the "position" of the ship, i. e., the distance it would have to travel in order to reach New Orleans. Because most ships came from Europe, they generally charged extra to pick up cargo in New Orleans, as compared to cargo to be picked up in closer ports on the Atlantic coast. Stanley accepted the best price on behalf of Fukaya. The time charter would then be executed between the shipowner and Fukaya, under its trade name "Compania Transporte Arroyo" (CTA).

Stanley also made inquiries of knowledgeable sources, including competitors and ship brokers, including the head of voyage charter operations for Simpson, Spence & Young, to ask for the market rate of a voyage charter for a ship of comparable size from New Orleans to Japan. (Agents of Simpson, Spence & Young confirmed that Stanley generally did request such market rates on voyage charters.) After so determining the current market price for a voyage charter, Stanley would arrange such a charter between CTA and Scrapco at a price which he considered to be slightly below market, in order to be sure that Scrapco, and all of its owners, were being treated fairly, and also to compensate Scrapco for his time and the time of other Scrapco employees who did work on the charters.

Pursuant to the Treasury regulations and Lufkin, taxpayers at the trial presented testimony of expert witnesses as to their opinion about the market on voyage charters at about the same time as each of the seven shipments of Scrapco in 1966. The first expert, who is a partner in a brokerage house which did no work previously for Scrapco or Fukaya, testified based upon actual comparable contracts by his firm and upon Maritime Research, Inc.'s Chartering Annual 1966 that the market was higher than the price Fukaya charged Scrapco. The second expert, who was a member of the Simpson, Spence & Young firm which did business with Fukaya, also testified on the basis of actual comparable contracts by his firm and the Chartering Annual, as well as data from a personal notebook

kept in 1966 listing prices he heard from other agents. The second expert testified to a market price slightly lower, on the average, than the market expressed by the first witness. The data from the second witness' testimony concerning market price as of the time of each Scrapco shipment, may be summarized below and compared to the price Fukaya charged Scrapco. In column A is the name of the vessel; column B, the price Fukaya charged Scrapco; column C, the capacity of the ship; column D, the price Fukaya charged Scrapco in terms of dollars per ton, which is obtained by dividing column B by column C; column E, the expert's opinion of the market price in terms of dollars per ton; column F, the difference between the market and Fukaya's charge, which is obtained by subtracting column D from column E; and column G, the effect the market charge would have had on the lump sum contract price, which is obtained by multiplying column C times column F.

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| | | LUMP SUM | | CHARGE | MARKET CHARGE | DIFFER-ENCE | DISCREP-ANCY |
| | VESSEL | PRICE | TONS | /TON | /TON | (E–D) | (C x F) |
| 1. | Hereford Beacon | 155,000 | 12,500 | 12.40 | 13.50 | 1.10 | 13,750 |
| 2. | Atlantic Sunrise | 153,000 | 13,150 | 11.56 | 12.88 | 1.32 | 17,358 |
| 3. | Atlantic Sun | 143,000 | 13,150 | 10.87 | 10.54 | ( .33) | ( 4,339) |
| 4. | Etnepjell | 175,000 | 15,100 | 11.59 | 11.15 | ( .44) | ( 6,644) |
| 5. | Thorsodd | 190,000 | 17,000 | 11.18 | 10.51 | ( .67) | (11,390) |
| 6. | Irish Rowan | 157,500 | 14,000 | 11.25 | 11.11 | ( .14) | ( 1,960) |
| 7. | Hadjitsakos | 165,000 | 14,400 | 11.46 | 10.85 | ( .61) | ( 8,784) |
| | | 1,138,000 | | | | | ( 2,009) |

Even if the more conservative expert's estimate of market price is used, Fukaya's lump sum price charged Scrapco was only $2,009 higher than the market price on $1,138,000 of total shipping business between the corporations in 1966.

The government also contends that Fukaya was provided certain services without charge. First, it points to the fact that Scrapco used its magnetic crane, rather than the shipowner using the crane on the ship, to load the scrap, and Scrapco's workers stayed around the clock during the days of loading. These services certainly benefitted Fukaya by speeding up the loading and thereby reducing the number of days of time charter, but the accelerated loading also benefitted Scrapco by enabling Scrapco to earn refunds called "dispatch" at the rate of $1,000 per day if the loadings were completed quickly. Moreover, the same procedures were used by Scrapco when loading completely independent ships.

Second, the government argues that the ships were allowed to use Scrapco wharves, rather than having to load in open water, and Scrapco provided fresh water for the journey. But the undisputed evidence shows that Scrapco did in fact charge Fukaya for the water and use of wharves at the same rate Scrapco charged independent shippers. The government's contentions regarding crane usage, wharf usage, water supply, and the like, illustrate clearly the tenuous basis of its attempt to justify its allocation of income between Fukaya and Scrapco.

Third, the government points to the fact that various employees of Scrapco rendered services for Fukaya without being directly compensated by Fukaya. Stanley, who received a salary of $40,000 from Scrapco for the year 1966 plus a bonus of $20,000, estimated that he spent about 30 hours during the year arranging the time charters for Fukaya. Computing this 30 hours as one and

one-half percent of his total time at work of 2,000 hours, the Court finds the value of his services rendered to Fukaya was $900. Wiley M. Wilkinson, Jr., a Scrapco accountant, estimated that he spent two weeks in 1966 on Fukaya matters, which was four percent of his total work time. Four percent of his annual salary of $12,000 suggests that the value of his time spent on behalf of Fukaya was $500. Erwin Engert, who supervised Scrapco's shipping operations, spent about one-fifth of his time for Fukaya, which would be worth about $2,800 based upon one-fifth of his $14,000 salary from Scrapco. Thus Scrapco employees rendered a total of $4,200 of services to Fukaya during 1966.

Finally, there may be a certain amount of other overhead which should have been charged to Fukaya. Wilkinson testified that his office made 110,000 bookkeeping entries and wrote 21,000 checks for Scrapco during 1966, while making 400 entries and writing 150 checks for Fukaya. On this basis it would seem that Fukaya was chargeable with less than one-half a percent of Scrapco's overhead.

■ In summary, the Court finds that the possible variation between Fukaya's voyage charter price and market price, as well as the amounts of services rendered Fukaya by Scrapco without any specific compensation, was less than $10,000. When compared to the $1,138,000 total shipping business between the two companies, the $10,000 discrepancy is reasonable. *Accord,* Treas.Dept.Rel. (Apr. 16, 1968). *See generally,* 2 J. Rabkin & M. Johnson, Federal Income, Gift & Estate Taxation, § 11.02, at 1108–09 (1968). Stanley testified that he believed he charged Scrapco a price lower than market in order to compensate Scrapco for the services. The Court finds his testimony credible, that he acted in good faith, and that it is completely supported by the testimony of independent experts. Therefore, the Court concludes that Scrapco's income was clearly reflected for the tax year 1966, with respect to shipping transactions concerning Fukaya.

■ Further, there was no "evasion" of taxes in this case. Stanley initially used domestic corporations for the time charters, which of course were subject to tax, and then he transferred this business to his Panamanian corporation, thus exempting from tax the income retained in the corporate entity. But this otherwise legitimate arrangement did not become tainted simply because it resulted in a tax savings. Numerous cases illustrate analogous situations where controlling interests properly structured their organization and transactions with tax-saving results. *See, e. g.,* United States Gypsum Co. v. United States, 7 Cir. 1971, 452 F.2d 445; Frank v. International Canadian Corp., 9 Cir. 1962, 308 F.2d 520; Raymond Pearson Motor Co. v. Commissioner of Internal Revenue, 5 Cir. 1957, 246 F.2d 509. As the Supreme Court pointed out in Commissioner of Internal Revenue v. First Security Bank of Utah, 405 U.S. 394, 398, n. 4, 92 S.Ct. 1085, 1089, n. 4, 31 L.Ed.2d 318 (1972):

> Taxpayers are, of course, generally free to structure their business affairs as they consider to be in their best interests, including lawful structuring (which may include holding companies) to minimize taxes. Perhaps the classic statement of this principle is Judge Learned Hand's comment in his dissenting opinion in Commissioner of Internal Revenue v. Newman, 159 F.2d 848, 850–851 (C.A. 2, 1947): "Over and over again courts have said that there is nothing sinister in so arranging one's affairs as to keep taxes as low as possible. Everybody does so, rich or poor; and all do right, for nobody owes any public duty to pay more than the law demands: taxes are enforced exactions, not voluntary contributions. To demand more in the name of morals is mere cant." See Knetsch v. United States, 364 U.S. 361, 365, 81 S.Ct. 132, 134, 5 L.Ed.2d 128 (1960); Chirelstein, Learned Hand's Contribution to

the Law of Tax Avoidance, 77 Yale L. J. 440 (1968).

Finally, this Court is also influenced by an important distinction between the principles relating to the legitimate exercise of such choices by a taxpayer from principles applicable to assignment of income. Professors Borris I. Bittker and James E. Eustice recognize such distinction as inherent in section 482 in their treatise Federal Income Taxation of Corporations and Shareholders ¶ 15.06, at 15-21 (1971). It appears that the Commissioner has lost sight of this distinction, and that the allocation in this case was made primarily because of the Commissioner's belief that Stanley had the power to control the flow of income to various controlled corporations.[1] If Scrapco actually earned the income, and Stanley artificially shifted or assigned the income earned by Scrapco to Fukaya, then a section 482 allocation might be appropriate. But here Stanley *chose* Fukaya to *earn* the income through the corporation's assumption of the primary risk incumbent upon the time charterer. This decision was initially motivated by Scrapco's historical preference to segregate the scrap business from the risks of the shipping business, so there was an over-riding bona fide business purpose for isolating the time charter business in another entity. In selecting the other entity Stanley had a right to pick one producing the least tax, and thus to take advantage of United States tax provisions equally available to Fukaya's competitors. Because Scrapco paid no more than an arm's length price to Fukaya, the Commissioner acted unreasonably, arbitrarily, and capriciously in allocating income. Accordingly,

It is hereby ordered that judgment be entered in favor of Stanley M. Diefen-

thal and Elka F. Diefenthal and against the United States in Civil Action No. 70-3582, and

It is further ordered that judgment be entered in favor of Southern Scrap Material Co., Ltd. and against The United States in Civil Action No. 70-3583.

---

1. The Commissioner's oversight regarding this distinction is reflected in his insistence in his post trial brief that the case of Philipp Bros. Chemicals, Inc. v. Commissioner of Internal Revenue, 2 Cir. 1970, 435 F.2d 53, is controlling in this case. In the *Philipp* case the Tax Court found as a matter of fact, and the Court of Appeals agreed, that the foreign corporations from which income was allocated *had not earned* the income they reported, but rather that the income was *assigned to them.* Thus, a significant distinction which influences the Court in this case also clearly distinguishes this case from *Philipp*, which the Commissioner cites as controlling.